(No. 13356.—Decree affirmed.)

JOSEPH R. MILLER, Appellee, *vs.* MAUDE BRINTON *et al.*
Appellants.

*Opinion filed June 16, 1920—Rehearing denied October 12, 1920.*

1. WILLS—*extrinsic evidence cannot be considered to change intention expressed in will.* The testator's intention must appear from the will itself when considered in connection with the testator's property, the objects of his bounty and the circumstances, but evidence of extrinsic circumstances cannot be considered for the purpose of giving effect to some supposed intention that the testator may have had in his mind but to which he gave no expression in his will.

2. SAME—*words "heirs" and "heirs-at-law" will be given technical meaning unless otherwise used by the testator.* The words "heirs" and "heirs-at-law" will be construed in their technical sense, as meaning those whom the law appoints to take an estate by inheritance, unless it appears from a consideration of the language of the entire will that the words were not used by the testator in their technical sense.

3. SAME—*laws of Illinois govern construction of will executed in another State affecting real estate in Illinois.* In construing a will executed in a foreign State affecting real estate in Illinois, where the testator was domiciled, the laws of Illinois will govern in ascertaining the testator's intention and in determining the effect of the provisions of the will.

4. SAME—*when devise in trust refers to heirs-at-law of beneficiary.* A devise in trust to the testator's wife and her successors in trust, for the benefit of his daughter, with directions to pay the income to said daughter and "upon her death to convey the same to such person or persons as she may by will appoint, and in default of such appointment to her heirs-at-law," refers to the heirs-at-law of the daughter and not to those of the wife, although the daughter was insane when the will was made.

5. DOMICILE—*what necessary to effect a change of domicile.* To effect a change of domicile the existing domicile must be abandoned without any intention to return to it and a new domicile must be acquired in another jurisdiction with the intention of making it a permanent home.

APPEAL from the Circuit Court of Macon county; the Hon. GEORGE A. SENTEL, Judge, presiding.

294—12

WEBBER & WEBBER, and LEFORGEE, BLACK & SAMUELS, for appellants Charles M. Hurst, the Millikin Trust Company and Maude Brinton.

JESSE E. HOFFMAN, for appellants Stephen P. Morehouse *et al.*

JOHN W. EVANS, WHITLEY & FITZGERALD, and T. F. DREW, for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

This suit is a triangular contest for certain property of which George E. Morehouse died seized and possessed. Morehouse for many years was engaged in business in Decatur, Illinois, and made his home there. Several years before his death he, with his wife, Martha, and only child and heir, Minnie Maud, ceased to reside in the family home in Decatur and went east, residing for a time in the States of Pennsylvania, New York, Connecticut and Massachusetts.' While residing in the State of New York, on June 24, 1897, Morehouse executed his will. He died in Boston, Massachusetts, May 12, 1906, leaving his wife and daughter surviving him. His will was probated and his estate administered and settled there. Authenticated copies of the will were filed in the office of the county clerk and in the office of the circuit clerk of Macon county, Illinois, where substantially all his real estate was situated. The provisions of the will involved in this litigation are the third and fifth paragraphs, but more particularly the third. Said paragraphs are as follows:

"*Third*—I give and devise to my wife, Mattie Morehouse, and her successors in the trust hereby created, all my undivided one-half interest in that certain lot of land and the buildings thereon situated in the city of Decatur and the State of Illinois, known as Nos. 134-140 East Main street, and now occupied by the Morehouse & Wells Com-

pany as a hardware store; in trust, however, to receive the rents and profits thereof, and after paying therefrom all taxes, insurance premiums and expenses of the maintenance and repairs, to pay over the net income from time to time to my daughter, Minnie Maud Morehouse, or apply the same for her use and benefit during her natural life, and upon her death to convey the same to such person or persons as she may by will appoint, and in default of such appointment to her heirs-at-law." * * *.

"*Fifth*—I give and bequeath to my wife, as trustee for my said daughter, Minnie Maud, one equal half part of all the rest, residue and remainder of my estate, real and personal, and I direct my wife, as such trustee, to hold the said moneys and to keep the same invested in good and lawful securities, and to pay over the income thereof to my daughter, Minnie Maud, during the term of her life; and I also authorize my wife, as such trustee, in her discretion, to pay over to my daughter, from time to time, such portions of the principal of the said trust fund, even the whole thereof, or to apply the same for her use and benefit, as in the judgment of my wife my daughter may need; and upon the death of my daughter the principal of said trust fund, or such part thereof, if any, as may remain, shall be paid over to such person or persons as she may by will appoint, and in default of such appointment to her legal representatives."

The widow accepted the trusts created and was by a decree of the circuit court of Macon county in December, 1911, appointed testamentary trustee, she and the daughter having returned to the old home in Decatur. Mrs. Morehouse died testate October 26, 1916. The daughter was never married, and after her mother's death went to Pennsylvania to reside, where she died intestate December 9, 1917. She never exercised the power of appointment in any manner under the will of her father. After the death of Mrs. Morehouse, Charles M. Hurst, her nephew, was by

the circuit court of Macon county appointed her successor as trustee. He subsequently resigned and the Millikin Trust Company was appointed to succeed him. Mrs. Morehouse by her will committed the care and custody of the daughter to her grand-niece, Maude Brinton. She directed that all her estate be held in trust by her executors and trustees for the use and benefit of her daughter, and at the daughter's death all the property and estate of the testatrix was to go to her nephew, Charles M. Hurst, and niece, Maude Brinton. After the death of the daughter, Maude, her uncle, Joseph R. Miller, her mother's brother, filed his bill in the circuit court of Macon county, claiming that as Maud failed to exercise the power of appointment under her father's will the trust property under the will descended to her heirs-at-law; that the complainant was her next of kin and only heir, and he asked that the trustee be directed to convey it to him as his sole and absolute property. He also claimed any personal estate governed by paragraph 5 remaining after the death of Maud and for an accounting to determine the amount. Charles M. Hurst and Maude Brinton, among others, were made defendants to the bill, and they, or some of them, filed pleas, which the court held insufficient, and the bill was answered by Hurst and Maude Brinton, setting up that Maud Morehouse was permanently and incurably insane at the time her father executed his will, and that upon her death the trust estate would under the will go to whomever her mother appointed by will, and in default of such appointment by the mother then to the mother's heirs-at-law; that the mother directed that all her estate remaining after the death of her daughter should go to Charles M. Hurst and Maude Brinton, and they claimed the property by the exercise of the power of appointment by Mrs. Morehouse, and also that under the will of George E. Morehouse if the power of appointment were not exercised by Maud, who was never married, the property would go to the heirs of Mrs. Morehouse upon the

death of the daughter. While the bill of Joseph R. Miller was still pending, a large number of persons, collateral kin of Maud Morehouse on her father's side, (whom for convenience we will hereafter refer to as the New York parties,) filed a bill alleging the domicile of George E. Morehouse was in New York when he executed his will.

The master in chancery to whom the cause was referred to take and report the testimony, with his conclusions, found among other facts that at the time George E. Morehouse executed his will his daughter, Maud, was mentally incompetent to contract or make a will and remained so until her death; that she was incompetent to choose her domicile and that Decatur was her domicile until her death. The master reported that under the will Joseph R. Miller, as the only heir-at-law of Maud Morehouse, was entitled to the property controlled by paragraphs 3 and 5 and was entitled to a decree as prayed in his bill, and that the claims of the New York parties and the claims of Charles M. Hurst and Maude Brinton were not supported by the law or facts. After overruling exceptions to the master's report the court entered a decree as prayed in the bill of Miller, reserving the matter of accounting for further reference to the master and further adjudication. From the decree the New York parties and Maude Brinton, Charles M. Hurst and the Millikin Trust Company in its various representative capacities appealed to this court.

The contention of Joseph R. Miller is that the law of Illinois controls the construction to be given the will; that the domicile of both George E. and Maud Morehouse was in Illinois; that under the will, if Maud failed to exercise the power of appointment the property was to go to her heirs-at-law; that he (Miller) is the only person who answers that description, and, as sole heir of Maud, at her death the property passed to him. Charles M. Hurst and Maude Brinton's position is that both the father and the daughter were domiciled in Illinois; that the father had in

mind that his daughter was permanently and incurably insane when he made his will, and his intention was she should be supported from the trust estate during her life and at her death the property should go to whomever her mother appointed by will, and she having by will appointed Charles M. Hurst and Maude Brinton to take it, it passed to and became theirs. They also contend the words of the will, "her heirs-at-law," refer to the heirs of Martha Morehouse and not to the heirs of Maud. The New York parties contend that George E. Morehouse was domiciled in New York and Maud in Pennsylvania at the time of her death; that the meaning and intention of the testator are to be ascertained and determined with reference to the New York law of descent, which confines the descent to the blood of the ancestor from whom the real estate came. Under the New York law, all the brothers and sisters of Morehouse having died before Maud's death, their descendants would inherit from Maud to the exclusion of her kin on her mother's side.

It will be seen that Miller and the New York parties agree that the power of appointment was by the will given to Maud, and that in the event of her failing to exercise the power, at her death the property would go to her heirs. They disagree on the question of fact as to the domicile of Morehouse and his daughter, and they differ as to whether the words "heirs-at-law" are to be understood and construed according to the laws of Illinois or the laws of New York. Hurst and Maude Brinton agree with Miller that the proof showed Morehouse and his daughter were domiciled in Illinois and that the laws of this State control the meaning and construction to be given the will, but they differ with both the other parties as to the construction that should be given the language of the will.

To our minds there is no sound basis for the construction contended for by Hurst and Maude Brinton. The language of the will is not involved but is plain, unam-

biguous and direct. The third paragraph devises the prop-
erty to the widow as trustee and to her successors in trust,
to pay over the net income to Maud or "apply the same
for her use and benefit during her natural life, and upon
her death to convey the same to such person or persons
as she may by will appoint, and in default of such appoint-
ment to her heirs-at-law." To support the position of
Hurst and Maude Brinton it is argued that Morehouse
knew his daughter was insane and confidently believed and
expected she would die before her mother, and that, know-
ing her mental condition, he could not have intended to
confer upon her the power of appointment, because she
was mentally incompetent to exercise it. By no recognized
rule of construction of language can the words "she" or
"her heirs-at-law" in the will be made to refer to Martha
Morehouse or to anyone other than Maud. In terms as
clear and distinct as the English language will permit, the
power of appointment by will was conferred on Maud,—
not on Martha,—and in default of appointment the prop-
erty was to be conveyed by the trustee to Maud's heirs,—
not to Martha's heirs. It is true, the master found from
the evidence that Maud was not mentally capable of mak-
ing a will at the time her father made his will, and she so
remained ever after. It appears from the evidence that in
her younger girlhood Maud was mentally normal, but later,
when about fifteen years old, she had what was called a
nervous breakdown. Her mentality was affected and im-
paired, from which she never recovered, and she was cared
for by a nurse or attendant. Apparently it was on account
of Maud's affliction her parents went east several years be-
fore the father's death. There is nothing in the will to
indicate that Morehouse knew when he made his will that
Maud would never recover and would never have mental
capacity to make a will. It is, in effect, argued that as she
never improved and her mind became almost a blank he
must have known she would never be able to exercise the

power conferred by the will and that he intended the power to be exercised by his wife. Whether it was reasonable or unreasonable in him to hope or expect his daughter would recover, that seems to have been his attitude and the attitude of his widow as long as she lived. At all events, there is nothing in the will or in the testimony, if it be conceded that it is competent for consideration in construing the will, to indicate the testator meant anything else than what the language used imports. The intention of the testator has been called the polar star in construing wills, but that intention must appear from the will itself, in connection with the testator's property, objects of his bounty and circumstances, and evidence of extrinsic circumstances cannot be considered for the purpose of giving effect to some supposed intention the testator may have had in his mind but to which he gave no expression in his will. Evidence of the surrounding circumstances will not be permitted to import into a will an intention different from that expressed by its language. *Hollenbeck* v. *Smith,* 231 Ill. 484; *Karsten* v. *Karsten,* 254 id. 480; *Nice* v. *Nice,* 275 id. 397; *Alford* v. *Bennett,* 279 id. 375.

The words "heirs" and "heirs-at-law," in their technical legal sense, mean those whom the law appoints to take the estate by inheritance, and unless qualified by other language in a will they will be given that meaning; but where it appears from a consideration of the language of the entire instrument they were not used by the testator in their primary sense they will be given the meaning intended by the testator. (*Black* v. *Jones,* 264 Ill. 548; *Walker* v. *Walker,* 283 id. 11.) There is nothing in the will of George E. Morehouse itself, or any circumstance connected with its execution, to indicate that he used the words "heirs-at-law" in any other than their primary sense. If, therefore, the law of Illinois is to control the construction and effect to be given the instrument, it was properly construed by the decree of the circuit court.

The New York parties do not dispute that the words "heirs-at-law" were used in their technical or primary sense, but contend the domicile of the testator at the time he made the will was in the State of New York and that the law of that State should control in its construction, and that it is to be presumed the testator so intended. This position is untenable on two grounds: (1) In construing a will executed in a foreign State affecting real estate in Illinois the laws of Illinois will govern in ascertaining the testator's intention and in determining the effect of the provisions of the will; (*Peet* v. *Peet,* 229 Ill. 341;) (2) the chancellor found and decreed, from the testimony, that the domicile of George E. Morehouse was in Illinois when he executed the will, and in our opinion that finding was supported by the testimony. Prior to the time he went east, in 1880 or 1882, he had resided in Decatur, where he was for many years engaged in business. We think the proof shows he went east in the hope of being able, through the benefit of schools or other means, to restore his daughter to health and normal mentality. He retained his business interests in Decatur, which were quite large, and frequently returned there to look after his affairs. He retained his ten-room residence he owned there till his death. For a few years after he went east four rear rooms of it were occupied by a family as caretakers, who paid no rent. The other rooms were then occupied by Morehouse's furniture. The residence was subsequently occupied by other persons who paid rent, but one room was reserved in which furniture and property of Morehouse was kept and he retained the key to that room. W. F. Calhoun occupied the house in 1897 and for nine or ten years thereafter. He testified he rented it verbally from month to month. Morehouse would not rent it any other way. He said he expected to return to live in it; that he was better satisfied there than any other place he had ever been. The witness understood him to regard Decatur as his home and that he intended to return there to

live. The testimony of other witnesses tends to show Morehouse regarded Decatur as his home and that his intention was to return there to reside. During his temporary visits there to look after his business interests he lived at the St. Nicholas Hotel, and as late as 1901 his name appeared in the city directory as president of the Morehouse & Wells Company and his residence as the St. Nicholas Hotel. He owned no real estate in New York, but all the real estate he owned, except some lots in St. Cloud, Minnesota, was in Illinois. We cannot say the court erred in finding his domicile was in Illinois. To effect a change of domicile it must be abandoned without any intention to return to it and a new domicile acquired in another jurisdiction with the intention of making it a permanent home. *Holt* v. *Hendee*, 248 Ill. 288.

The decree of the circuit court is supported by the law and the evidence, and it is affirmed.    *Decree affirmed.*